**PORT OF PORTLAND**
Daniel Blaufus, General Counsel
OSB Bar No. 932144
Daniel.Blaufus@portofportland.com
Beverly Pearman, Assistant General Counsel
OSB Bar No. 994524
Beverly.Pearman@portofportland.com
L. Ansley St. Clair, Associate General Counsel
Anzie.StClair@portofportland.com
OSB Bar No. 104594
7200 N.E. Airport Way
Portland, Oregon 97218

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
ssummy@baronbudd.com
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
cburkepickrel@baronbudd.com
Celeste Evangelisti *(pending Pro Hac Vice)*
(CA Bar No. 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-428; Tel: (214) 521-3605

**GOMEZ TRIAL ATTORNEYS**
John P. Fiske *(pending Pro Hac Vice)*
(CA Bar No. 249256)
jfiske@gomeztrialattorneys.com
655 West Broadway, Suite 1700
San Diego, CA 92101; Tel: (619) 237-3490

*Attorneys for Plaintiff Port of Portland*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| PORT OF PORTLAND, a port district of the State of Oregon,<br><br>    Plaintiff,<br>vs.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA LLC.,<br>    Defendants. | Case No.<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT**<br><br>***Demand for Jury Trial*** |

Page 1 –    PLAINTIFF'S ORIGINAL COMPLAINT

## I.   INTRODUCTION

1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.      The extent of PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.      U.S. EPA (2000b) has classified PCBs as "probable human carcinogens." Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), "[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while

Page  2  –    PLAINTIFF'S ORIGINAL COMPLAINT

other studies have not shown effects.  Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores."

5.      PCBs have been found in sediments, water and fish in the Columbia River, the McBride Slough, and the Willamette River ("Portland Waters").  PCBs were used historically in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications and, after being released into the environment, contaminate runoff from naturally occurring storm and rain events.  The contamination has persisted in Portland Waters originating from multiple sources and industries and entering Portland Waters through stormwater, other runoff and from historic industrial in-water or near-water activities.

6.      The fate and transport of PCBs in stormwater causes contamination in sediments and Portland Waters, through no fault of the Port of Portland, which lawfully discharges water into several bodies of water through National Pollutant Discharge Elimination System ("NPDES") permits.

7.      Portland Waters are contaminated with PCBs, which have been detected in water, sediment, fish and wildlife.

8.      The U.S. Environmental Protection Agency ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for certain Portland Waters.

9.      A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of pollutant that an impaired body of water can receive and still safely meet water quality standards.[1]

10.     Portland Waters are impaired due to the presence of PCBs.

---

[1] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

Page  3  –    PLAINTIFF'S ORIGINAL COMPLAINT

11.     The Port of Portland has spent money to investigate, monitor, analyze, and remediate PCB contamination in Portland Harbor sediments and soils.  The Port of Portland is expected to spend significant sums in the future to further investigate, monitor, analyze, remediate and mitigate PCB contamination.

12.     Plaintiff has expended resources and money to investigate, monitor, analyze, and remediate PCB contamination in the McBride Slough.

13.     Plaintiff PORT OF PORTLAND hereby alleges, upon information and belief, as follows:

## II.     PARTIES

14.     The PORT OF PORTLAND ("The Port") is a port district of the State of Oregon, duly organized and existing by virtue of the laws of the State of Oregon.

15.     Plaintiff manages and operates municipal conveyance systems, which collect and transport wastewater and stormwater to be discharged into Portland Waters pursuant to NPDES permits under the Clean Water Act.

16.     Plaintiff has never produced, sold, or otherwise manipulated PCBs, has never operated a facility that produced or sold PCBs, and has never added PCBs to its wastewater or stormwater.  Plaintiff may have purchased consumer products containing PCBs while they were legally sold from the 1930s to 1979.

17.     Plaintiff passively (and for years unknowingly) gathered PCBs that settled into wastewater and stormwater through the chemicals' natural fate and transport characteristics.

18.     Plaintiff is and will be required by the U.S. EPA to investigate contamination and/or remediate sediment, including for PCBs, in Portland Harbor.  Plaintiff's obligations to the EPA stem from its status as a current or former owner of several marine terminals and other properties on the Willamette River that are contaminated by the release of PCBs into the Willamette River. In addition, Plaintiff is and will be required by the Oregon Department of Environmental Quality ("DEQ") to investigate and cleanup soil contamination adjacent to the

Page 4  –    PLAINTIFF'S ORIGINAL COMPLAINT

Willamette River and sediment contamination in McBride Slough, which includes PCBs. Thus, Plaintiff has spent money in efforts to investigate, remediate, reduce, and monitor PCBs. Plaintiff will spend more money in the future, including for additional remediation efforts.

19.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

20.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

21.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

22.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

23.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

24.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[2]

---

[2] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013);  *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

Page 5 –    PLAINTIFF'S ORIGINAL COMPLAINT

25.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[3]

26.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[4]

27.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.     JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in Oregon, but no Defendant is a citizen of Oregon.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

29.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

---

[3] *See id.*
[4] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

## IV.    PLAINTIFF'S STANDING

### A.  Portland International Airport

30.    The Port owns all stormwater system infrastructure for Portland International Airport ("PDX"). This system discharges to the Columbia River, the Columbia Slough, and the McBride Slough.

31.    The Port owns the beds and the banks of a portion of McBride Slough and is currently incurring costs remediating contamination in McBride Slough caused by PCBs and other contaminants, which receives stormwater from PDX and adjacent private properties.

### B.  Terminal 4

32.    T4 is located on the east side of the Willamette River. T4 consists of two docking slips – Slip 1 and Slip 3 – and an embayment, known as Wheeler Bay, that, at one time, may have been referred to as Slip 2. The Port owns stormwater infrastructure at T4.  Certain portions of T4 are contaminated with Monsanto's PCBs, including Port property and infrastructure.

33.    The Port has riparian rights associated with its ownership of T4. The Port also owns overwater berths and a portion of the submerged and submersible lands in Slip 1 and Slip 3 at T4.  The Port is responsible for maintenance dredging of these berths, including the disposal of all dredge material.

34.    To the extent that dredge material cannot be disposed of in-water due to contamination from PCBs and other contaminants, the Port bears the increased cost associated with upland disposal.

### C.  Other Marine Terminals

35.    The Port also owns three additional marine terminals: Terminal 6 ("T6") on the Columbia River; Terminal 5 ("T5") on the east bank of the Willamette River; and Terminal 2 ("T2") on the west bank of the Willamette River.

Page 7 –    PLAINTIFF'S ORIGINAL COMPLAINT

36.     The Port has riparian rights associated with its ownership of T6, T5, and T2. The Port also owns overwater berths and is responsible for maintenance dredging of these berths, including the disposal of all dredge material.

37.     The Port owns stormwater infrastructure at T2, T6, and T5. T6 has outfalls on the Columbia River, and T5 and T2 both discharge to the Willamette River. Certain portions of these marine terminals are contaminated with Monsanto's PCBs.

D.  Swan Island

38.     The Port is the past and current owner of property in the Swan Island lagoon ("SIL") area, on the east side of the Willamette River. Certain portions of the SIL area, including those owned by the Port, are contaminated with Monsanto's PCBs. PCBs have been identified as the primary risk driver for the sediments adjacent to SIL.

39.     In 2012 stormwater system samples collected by the City of Portland from Outfall S-1 (also on the east side) detected PCBs and other contaminants.

40.     When it owned the Swan Island shipyard and associated overwater structures, the Port had riparian rights associated with the overwater structures. The Port also was responsible for maintenance dredging in these areas, including the disposal of all dredge material. To the extent that dredge material could not be disposed of in-water due to contamination from PCBs and other contaminants, the Port bore the increased cost associated with upland disposal.

E.  Willamette River Navigational Channel

41.     The Army Corps of Engineers ("Corps") is responsible for maintaining the federal navigation channel in Portland Harbor, and the Port is the state-designated local sponsor to the Corps. In accordance with these responsibilities, the Corps and the Port work together on new construction and deepening projects in the federal

Page  8  –     PLAINTIFF'S ORIGINAL COMPLAINT

navigation channel as needed to facilitate navigation and commerce and respond to changing market conditions.

42.    The Corps pays the Port to conduct the dredging, and the Port is responsible for costs of disposal of the dredge material. To the extent that dredge material cannot be disposed of in-water due to contamination from PCBs and other contaminants, the Port bears the increased cost associated with upland disposal.

43.    The Corps intends to continue dredging of the navigational channel after remediation of Portland Harbor. Thus, the Port will incur additional costs associated with the disposal of this sediment.

## V.    FACTUAL ALLEGATIONS

   A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.

44.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). A "PCB congener" is any single, unique chemical compound in the PCB category. Over 200 congeners have been identified.[5]

45.    PCBs were generally manufactured as mixtures of congeners. From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[6] Monsanto manufactured PCBs in Illinois and Alabama. The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

46.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start

---

[5] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[6] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). See also MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

Page 9 –    PLAINTIFF'S ORIGINAL COMPLAINT

capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

47.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

48.     PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds can escape from totally-enclosed materials (such as transformers or capacitors) and contaminate and damage surrounding materials.

49.     PCBs present serious risks to the health of humans, wildlife, and the environment.

50.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.  PCBs are known to bioaccumulate in fish and other species; some human health risks are attributable to eating contaminated fish. EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[7]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

51.     In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

52.     PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other

---

[7] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

Page  10  –   PLAINTIFF'S ORIGINAL COMPLAINT

infections.

53.      Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

54.      Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning.

55.      PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.

56.      PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

57.      PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[8]

B.  Monsanto Has Long Known of PCBs' Toxicity.

58.      Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [9]

_____

[8] *See* EPA, Understanding PCB Risks, available at
http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment
(last accessed March 5, 2015).
[9] *See* Exhibits B, C, F

Page 11 – PLAINTIFF'S ORIGINAL COMPLAINT

59.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

60.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

61.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

62.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[13]

63.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14]

---

[10] MONS 061332, attached as Exhibit B.
[11] MONS 095196-7, attached as Exhibit C.
[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[13] MONS 095640, attached as Exhibit E.
[14] *See* JDGFOX00000037-63, attached as Exhibit F.

Page  12  –   PLAINTIFF'S ORIGINAL COMPLAINT

Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

C.  Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

64.     At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[17]

65.     Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[18]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[19]

66.     A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[20]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

67.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

---

[15] *Id*. at JDGFOX00000039.
[16] *Id*. at JDGFOX00000037.
[17] See Exhibits G, H, L,
[18] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.
[19] *Id*.
[20] R.W. Risebrough, Polychlorinated Biphenyls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

Page  13  –   PLAINTIFF'S ORIGINAL COMPLAINT

68.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[21]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[22]

69.    On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo titled "Defense of Aroclor."[23]  He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[24]

70.    On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[25]

---

[21] MONS 096509-096511, attached as Exhibit I.
[22] *Id*.
[23] DSW 014256-014263, attached as Exhibit J.
[24] *Id*.
[25] MONS 098480, attached as Exhibit K.

Page  14  –   PLAINTIFF'S ORIGINAL COMPLAINT

71.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[26]

72.     The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCBs "may be a global contaminant."[27]  The meeting minutes acknowledge that PCBs had been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[28]

73.     A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

---

[26] Ex. A at 058737.
[27] MONS 030483-030486, attached as Exhibit L.
[28] *Id*.at 030485.

Page  15  –   PLAINTIFF'S ORIGINAL COMPLAINT

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[29]

74.    Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1.    Protect continued sales and profits of Aroclors;
2.    Permit continued development of new uses and sales, and
3.    Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[30]

75.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [31]

---

[29] DSW 014612-014624, at 014615, attached as Exhibit M.
[30] *Id.*
[31] MONS 100123-100124, attached as Exhibit N.

Page  16  –   PLAINTIFF'S ORIGINAL COMPLAINT

76.      In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

77.      Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[32]

78.      After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[33]  To address these concerns, U.S. EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California;  in fish and birds;  in lakes and rivers;  in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage treatment facilities;  in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[34]

79.      U.S. EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[35]

80.      At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical

---

[32] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[33] *Id*. at 1.
[34] *Id*., *passim*.
[35] *Id*.

Page  17  –   PLAINTIFF'S ORIGINAL COMPLAINT

processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and coatings for chemical plants, boats, and highway marking. [36]

81.    A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [37]

82.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

83.    A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[38]

---

[36] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.
[37] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
[38] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.

Page  18  –   PLAINTIFF'S ORIGINAL COMPLAINT

D.  Monsanto Concealed the Nature of PCBs from Governmental Entities.

84.  While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.[39]

85.  In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[40]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[41]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[42]

86.  In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[43]

87.  Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[44]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to

---

[39] See Exhibits O-R (letters to governmental agencies).
[40] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[41] Id.
[42] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
[43] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[44] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

Page  19  –  PLAINTIFF'S ORIGINAL COMPLAINT

conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[45]

E.    Monsanto's Post-Sale Negligence and Conduct

88.    Monsanto first started releasing its PCB products into the U.S. stream of commerce as early as the 1930s, including for use in multiple applications. As early as the 1930s Monsanto knew its PCB products were toxic to human health.

89.    Monsanto continued to sell its PCB products into and through the 1940s and 1950s, and continued to gain superior knowledge of the toxic health effects, volatility, and persistence of PCBs in and from intended applications.  For example, in the 1950s, the United States Navy notified Monsanto that it would no longer use Pydraul, a PCB containing hydraulic fluid because of the toxicity and volatility of the PCBs. Monsanto continued to gain superior knowledge about its PCB products but negligently and intentionally failed to act in response to this superior knowledge.

90.    Despite Monsanto's growing superior knowledge in the 1940s and 1950s, Monsanto's conduct constituted post-sale negligence in the following ways:

a.    Monsanto negligently and intentionally failed to update its previous and current customers, ongoing end-users, and governmental entities regarding the proper use and/or disposal of its PCB containing products, thereby creating an ongoing risk of environmental contamination.

b.    Monsanto continued to negligently and intentionally actively conceal from its previous and current customers, ongoing end-users, and governmental entities the toxicity, volatility, and persistence of PCBs.

91.    Monsanto continued to sell its PCB products into and through the 1960s, and continued to gain superior knowledge of the toxic health effects, volatility, and persistence of

---

[45] *Id.*

Page  20  –   PLAINTIFF'S ORIGINAL COMPLAINT

PCBs in and from intended applications.  For example, in the 1960s, Monsanto learned that PCBs were a global environmental pollutant, contaminating sediment, water, wildlife, and humans, including specifically along U.S. western coastlines. Monsanto continued to gain superior knowledge about its PCB products but negligently and intentionally failed to act in response to this superior knowledge.

92.     Despite Monsanto's growing superior knowledge in the 1960s, Monsanto's conduct constituted post-sale negligence in the following ways:

     a.   Monsanto negligently and intentionally failed to update its previous and current customers, ongoing end-users, and governmental entities regarding the proper use and/or disposal of its PCB containing products, thereby creating an ongoing risk of environmental contamination.

     b.   Monsanto continued to negligently and intentionally actively conceal from its previous and current customers, ongoing end-users, and governmental entities the toxicity, volatility, and persistence of PCBs in the environment.

93.     Monsanto continued to sell its PCB products into and through the 1970s, and continued to gain superior knowledge of the toxic health effects, volatility, and persistence of PCBs in and from intended applications.  For example, in the late 1960s and through the 1970s, Monsanto learned further of the fate and transport of PCBs from their intended applications into the environment. Monsanto continued to gain superior knowledge about its PCB products but negligently and intentionally failed to act in response to this superior knowledge.

94.     Despite Monsanto's growing superior knowledge in the late 1960s and through the 1970s, Monsanto's conduct constituted post-sale negligence in the following ways:

     a.   Monsanto negligently and intentionally failed to update its previous and current customers, ongoing end-users, and governmental entities regarding the proper use and/or disposal of its PCB containing products, thereby creating an ongoing risk of environmental contamination.

Page  21  –   PLAINTIFF'S ORIGINAL COMPLAINT

b.  Monsanto continued to negligently and intentionally actively conceal from its previous and current customers, ongoing end-users, and governmental entities the toxicity, volatility, and persistence of PCBs in the environment.

95.     Monsanto was banned from producing and selling PCBs after the late 1970s. However, after the late 1970s and into the 1980s and thereafter, Monsanto continued to gain superior knowledge about its PCB products but negligently and intentionally failed to act in response to this superior knowledge.

96.     Despite Monsanto's growing superior knowledge in the late 1970s and into the 1980s and thereafter, Monsanto's conduct constituted post-sale negligence in the following ways:

a.  Monsanto negligently and intentionally failed to update its previous and current customers, ongoing end-users, and governmental entities regarding the proper use and/or disposal of its PCB containing products, thereby creating an ongoing risk of environmental contamination.

b.  Monsanto continued to negligently and intentionally actively conceal from its previous and current customers, ongoing end-users, and governmental entities the toxicity, volatility, and persistence of PCBs in the environment.

97.     Monsanto's negligent and intentional active concealment of the toxicity, volatility, fate and transport, and persistence of PCBs lead directly to the continued misuse and improper disposal of its PCB containing products for decades after each products' sale and introduction into the stream of commerce, causing injury and damage to Plaintiff.

a.  Monsanto negligently and intentionally failed to update its previous and current customers, ongoing end-users, and governmental entities regarding the proper use and/or disposal of its PCB containing products, thereby creating an ongoing risk of environmental contamination.

b.  Monsanto continued to negligently and intentionally actively conceal from its

Page  22  –   PLAINTIFF'S ORIGINAL COMPLAINT

previous and current customers, ongoing end-users, and governmental entities the toxicity, volatility, and persistence of PCBs.

98.    Monsanto's negligent and intentional active concealment of the toxicity, volatility, fate and transport, and persistence of PCBs lead directly to the continued misuse and improper disposal of its PCB containing products for decades after each product's sale and introduction into the stream of commerce, causing injury and damage to Plaintiff.

F.    Portland Waters are Impaired Due to PCB Contamination

99.    As described above, Portland Waters are impaired due to PCB Contamination.

100.    Under the Clean Water Act, Oregon has designated uses for the Columbia and Willamette Rivers that include commercial, recreation, navigation, boating, fishing and wildlife habitat.

101.    The Columbia and Willamette Rivers are listed by the State of Oregon on its list of impaired water bodies, in accordance with section 303(d) of the Clean Water Act.

102.    PCBs are a widespread contaminant in Portland Waters and have been detected in water, fish tissue and sediment samples in the Willamette River, McBride Slough, and other Portland area tributaries.

103.    The Oregon Health Authority has issued fish consumption advisories for all resident fish in the Willamette River due to contamination from PCBs[46].

104.    Monsanto's PCBs have continuously and systematically contaminated Portland Waters through discharges from stormwater and wastewater systems since Monsanto placed PCBs, one of the most ubiquitous contaminants in the world, into the stream of commerce.

105.    By the time Congress passed the Toxic Substances Reform Act, which became effective October 11, 1976, Monsanto's PCBs had already begun to vaporize, leach, leak, and volatilize into Portland stormwater collection systems, including the Port's, contaminating

---

[46]https://public.health.oregon.gov/HealthyEnvironments/Recreation/FishConsumption/Pages/fish advisories.aspx

Page  23  –   PLAINTIFF'S ORIGINAL COMPLAINT

Portland Waters, the environment, water, sediment, fish, and wildlife.

106.    Since at least 1976, PCBs have continuously and systematically entered and contaminated stormwater collection systems, including the Port's.

107.    Monsanto's PCBs pass into and through Portland's stormwater collection systems, including the Port's, and have been doing so continuously since before 1976.

108.    Monsanto PCBs will continue to contaminate stormwater collection systems, including the Port's, for years to come if not remediated.

## FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

109.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

110.    Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Portland Waters.

111.    The presence of PCBs interferes with the comfortable enjoyment of Portland Waters for customary uses for fishing, swimming, and other water activities.

112.    The presence of PCBs interferes with the free use of certain Portland Waters for the promotion of commerce, navigation, and fisheries.

113.    The presence of PCBs interferes with the free use of Portland Waters for ecological preservation and habitat restoration.

114.    The Clean Water Act, through the NPDES Permit system, requires the Plaintiff to reduce its discharge of contaminants in stormwater to the maximum extent practicable.

115.    The presence of PCBs causes inconvenience and annoyance to Plaintiffs, who are charged with reducing and monitoring PCB discharges in order to protect human health and the environment.

116.    The condition affects a substantial number of people who use certain Portland

Page  24  –   PLAINTIFF'S ORIGINAL COMPLAINT

Waters for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

117.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

118.    The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

119.    The Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and the Plaintiff has incurred substantial costs from investigating, monitoring and remediating PCB contamination.

120.    Plaintiff did not consent to the conduct that resulted in the contamination of Portland Waters.

121.    Monsanto's conduct was a substantial factor in causing the harm to the Plaintiffs.

122.    Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in Portland Waters.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

123.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continues to suffer, monetary damages to be proven at trial.

Page  25  –   PLAINTIFF'S ORIGINAL COMPLAINT

124.     Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION

## COMMON LAW INDEMNITY

125.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

126.     Plaintiff has incurred costs to remediate, monitor, and investigate Monsanto's PCBs in Port stormwater and wastewater systems and Portland Waters.

127.     Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around Portland Waters.

128.     Between Monsanto and the Plaintiff, Monsanto should be responsible for the costs to address PCB contamination, as the conduct of Plaintiff did not contribute in any way to the creation of the public nuisance.

## THIRD CAUSE OF ACTION

## PRODUCTS LIABILITY - DESIGN DEFECT

129.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

130.     When PCBs left Monsanto's hands, they were in a condition that was not contemplated by the ultimate users and consumers and was unreasonably dangerous to all persons and property exposed due to the design of Monsanto's PCBs.

131.     Monsanto sold PCBs and was engaged in the business of selling PCBs.

132.     Monsanto's PCBs were in a defective condition that was unreasonably dangerous to the ultimate users, consumers, and population at large when the product left the defendant's hands.

Page  26  –   PLAINTIFF'S ORIGINAL COMPLAINT

133.    Monsanto's PCBs were intended to and did reach users and consumers without substantial change in condition.

## FOURTH CAUSE OF ACTION

### PRODUCTS LIABILITY - FAILURE TO WARN

134.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

135.    Monsanto failed to give adequate warnings or instructions regarding the use of PCBs.  Without adequate warnings or instructions, Monsanto's PCBs were unreasonably dangerous.

136.    When PCBs left Monsanto's hands, they were in a condition that was not contemplated by the ultimate users and consumers and was unreasonably dangerous to all persons and property exposed due to Monsanto's failure to give adequate warning or instructions relating to its PCBs.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE AND POST-SALE NEGLIGENCE

137.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

138.    Monsanto's conduct, including the post-sale negligence and conduct described above, was negligent.

139.    Monsanto's negligent conduct, including the post-sale negligence and conduct described above, was a cause of harm to the plaintiff.

140.    The harm was reasonably foreseeable.

## SIXTH CAUSE OF ACTION

### TRESPASS

141.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

Page  27  –   PLAINTIFF'S ORIGINAL COMPLAINT

142.     Monsanto's PCBs have, without authorization, entered Plaintiff's property.

143.     Monsanto acted negligently and/or recklessly in manufacturing PCBs and marketing and selling them for widespread use.  This negligent and/or reckless conduct caused the PCBs to trespass upon Plaintiff's property.

144.     Monsanto acted intentionally, knowing that a trespass would result from its actions, as PCBs cannot be contained.  As a result of these actions, PCBs have trespassed upon Plaintiff's property.

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.     Compensatory damages according to proof;

2.     Punitive damages;

3.     Litigation costs and attorney's fees as provided by law;

4.     Pre-judgment and post-judgment interest;

5.     Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.


Dated:  January 4, 2017                    Respectfully submitted,


                                        s/ Beverly Pearman
                                        **PORT OF PORTLAND**
                                        Beverly Pearman, Assistant General Counsel,
                                        OSB No. 994524
                                        Beverly.Pearman@portofportland.gov
                                        Daniel Blaufus, General Counsel,
                                        OSB Bar No. 932144
                                        Daniel.Blaufus@portofportland.com
                                        L. Ansley St. Clair, Associate General
                                        Counsel, OSB Bar No. 104594
                                        Anzie.StClair@portofportland.com
                                        7200 N.E. Airport Way
                                        Portland, Oregon 97218

Page  28  –   PLAINTIFF'S ORIGINAL COMPLAINT

**GOMEZ TRIAL ATTORNEYS**
John P. Fiske *(pending Pro Hac Vice)*
655 West Broadway, Suite 1700
San Diego, California 92101

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
Carla Burke *(pending Pro Hac Vice)*
Celeste Evangelisti *(pending Pro Hac Vice)*
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281